1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   KAREN BERTELSEN,                     No.  2:12-cv-01440-TLN-GCH

12              Plaintiff,

13        v.                              **FINDINGS OF FACT AND**
                                          **CONCLUSIONS OF LAW**
14   HARTFORD LIFE INSURANCE
     COMPANY,
15
                Defendant.
16

17

18        This action arises out of Defendant Hartford Life and Accident Insurance Company's

19   ("Defendant") termination of Plaintiff Karen Bertelsen's ("Plaintiff") long-term disability

20   benefits.  This motion is before the Court on Plaintiff's motion for judgment pursuant to Rule 52[1]

21   (ECF No. 17) and Defendant Hartford Life and Accident Insurance Company's motion for

22   judgment pursuant to Rule 52 or alternatively for summary judgment pursuant to Rule 56 (ECF

23   No. 20).  Each party opposes the other's motion.  (ECF Nos. 24, 25.)  The Court has carefully

24   considered the parties' arguments, and hereby grants Plaintiff's motion for judgment pursuant to

25   Rule 52.

26

27   [1] All references to the "Rules" refer to the Federal Rules of Civil Procedures unless otherwise
     specified.
28

                                              1

**I.      FINDINGS OF FACT**[2]

A.      **Plaintiff Files a Claim for Long-Term Disability Benefits**

1.      Plaintiff Karen Bertelsen was born on July 4, 1964.

2.      Plaintiff was employed by Soma Networks, Inc.  ("Soma") as an engineering document control manager.  She worked for Soma from 2006 to 2008.

3.      Her job duties as a document control manager were sedentary.  Her job duties generally required her to communicate engineering plan changes to appropriate parties, create policies and procedures, and troubleshoot.  To carry out her duties, she would frequently type and sit, and occasionally walk, stand, balance, stoop, and reach overhead to work.

4.      During Plaintiff's employment with Soma, the company offered long-term disability benefits funded through an insurance policy issued by Defendant.

5.      Defendant both administered and funded the long-term disability benefits at issue in this action.  (Def.'s Opp'n Pl.'s Mot. J., ECF No. 25 at 1:12–13.)

6.      The applicable long-term disability benefits plan has two definitions of disabled.  In order to qualify as "disabled" under the first definition, the employee must be unable to work in the employee's own occupation for the first two years.  Specifically, the policy provides "Disability or Disabled means that during the Elimination Period and or the next 24 months you are prevented by: accidental bodily injury, sickness; mental illness; substance abuse; or pregnancy from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings."  (Soma Networks, Inc., Long Term Disability, Life and Acc. Death & Dismemberment, ECF No. 2-1 at CF 000003–52.)

7.      After the first two years, the definition of disability becomes more restrictive and requires that the employee is unable to work in any occupation.  Specifically, the policy provides: "After that, you must be prevented so from performing one or more of your Essential Duties of Any Occupation."  The policy defines "any occupation" as "an occupation for

---

[2] The facts described herein derive from the separate statements of fact submitted by the parties. The facts are undisputed except where noted by the Court.

which you are qualified by education, training, or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance."  The policy also defines "essential duty" as a duty that is "substantial, not incidental; is fundamental or inherent to the occupation; and cannot be reasonably omitted or changed." (ECF No. 2-1 at CF 000003–52.)

8.      The policy provides that "When do benefits become payable? You will be paid a monthly benefit if: 1. You become Disabled while insured under this plan; 2. You are Disabled throughout the Elimination Period; 3. You remain Disabled beyond the Elimination Period; 4. You are, and have been during the Elimination Period, under the Regular Care of a Physician; and 5. You submit Proof of Loss satisfactory to us.  Benefits accrue as of the first day after the Elimination Period and are paid monthly."  (Admin. Record, ECF No. 2-1 at CF 000003–52.)

9.      The policy provides:  "When will benefit payments terminate? 1. The date you are no longer Disabled as defined; . . . ."  (ECF No. 2-1 at CF 000003–52.)

10.      The policy contains a discretionary clause, providing: "Who interprets policy terms and conditions?  We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (ECF No. 2-1 at CF 000003–52.)

11.      The policy provides the participant with appeal rights which included, without limitation, the participant's right to submit new or different information in addition to what had been submitted during the consideration of the claim.  The policy requires an independent review of the appeal, by an individual who did not make the initial decision, and who was not the subordinate of the person who made the decision.

12.      In July 2008, Plaintiff submitted a claim for long-term disability benefits, based on her complaints of back pain.

3

**B.** **Defendant and the Social Security Administration Determine Plaintiff is Disabled Under Their Respective Definitions**

13. After reviewing Plaintiff's medical records, Defendant approved Plaintiff's claim by letter dated September 12, 2008, retroactive to July 3, 2008. Defendant's finding was pursuant to the policy's "own occupation" definition of disability.

14. Plaintiff was a member of Kaiser Permanente, and primarily treated by nurse practitioner Roberta Heck between September 12, 2008, and 2010 for degenerative changes of her lower lumbar spine.

15. Plaintiff was also treated by chiropractor Dr. Kyle Yoder once or twice per week from September 23, 2009, through November 2010. (ECF No. 20 n. 3.)

16. In 2009, Plaintiff also consulted Dr. Tracy Ann Jones, a physical medicine and rehabilitation doctor with Kaiser. Dr. Jones provided Plaintiff with an epidural steroid injection for pain on March 6, 2009. (ECF No. 20 at 5:19-6:1.) Dr. Jones provided Plaintiff with a second epidural steroid injection on October 8, 2009. (ECF No. 20 at n. 5.)

17. Ms. Heck examined Plaintiff on February 1, 2010, and ordered a new MRI to compare with an MRI taken in 2006.

18. On April 27, 2010, Ms. Heck advised Plaintiff in writing that her MRI showed "mild worsening at most disc levels." (ECF No. 4-4 at CF 000767.) Plaintiff did not see Ms. Heck after February 1, 2010.

19. Plaintiff also consulted with osteopath Dr. Robert Gabby in connection with her claim for Social Security Disability Benefits.

20. Defendant conducted an Employee Analysis Assessment dated June 22, 2010. Based on the information then available, Defendant determined that Plaintiff was not capable at that point of returning to qualifying employment. Defendant determined that there were no occupations that appeared to be reasonable for the purpose of the analysis, either because Plaintiff was not qualified to perform the job, the occupations were not available 30 hours per week, or they did not meet the required potential earnings.

21. By letter dated June 23, 2010, Defendant determined that Plaintiff qualified

4

for long-term disability benefits under the expanded definition of disability which included the inability to work in "any occupation."  The approval letter states:  "[Y]ou must meet a different definition of Disability in order to remain eligible for LTD benefits on and after 07/01/2010.  We have conducted a thorough review of all the medical and vocational information in your claim file.  Based upon that review, we have determined that you meet the policy definition of Disability and that you will continue to qualify for benefits on and after 07/01/2010."  (ECF No. 6-1 at CF 000835–36.)

22.     By letter dated March 6, 2011, the Social Security Administration ("SSA") informed Plaintiff that she was entitled to monthly disability benefits retroactive to September 2008.  (ECF No. 2-4 at CF 000194–200.)

**C.     Defendant Investigates Plaintiff's Disability Claim Using Surveillance and Orders an Independent Medical Evaluation**

23.     On March 24, 2010[3], Defendant conducted a further review of Plaintiff's disability claim, including the restrictions and limitations stated by Nurse Practitioner Heck.  In Nurse Heck's attending physician statement, she suggested that Plaintiff was unable to return to work in any occupation.  Defendant, however, believed that Plaintiff's medical records showed that her disability was not that severe.[4]  Because Defendant believed that Nurse Heck's restrictions contradicted Plaintiff's medical records, it determined that further investigation was appropriate.  Plaintiff disputes Defendant's opinion.

24.     Defendant hired an investigator to conduct surveillance of Plaintiff.  In August 2010, the investigator conducted surveillance of Plaintiff.  The surveillance showed Plaintiff walking, driving, standing, slamming down the hood of her car, jogging to a bus, and riding a bicycle.  The surveillance also showed that Plaintiff spent several hours at the Wikiup Holistic Health and Awareness Center (a massage spa) on two of the days on which surveillance

---

[3] Defendant made the determination to further investigate Plaintiff's claim in March 2010.  The record is silent as to why Defendant approved Plaintiff's long-term disability benefits while simultaneously investigating the veracity of her medical statements.  The discord is addressed in the analysis section.

[4] Nurse Heck's statement indicated that Plaintiff was volunteering regularly at a food bank and Plaintiff was training to be a masseuse and had obtained a massage license.  (ECF No. 2-3 at CF 000133.)

1   occurred.

2      25. On November 18, 2010, the investigator met with Plaintiff at the Santa

3   Rosa Central Library and prepared a report of that meeting.  At that meeting, Plaintiff represented

4   the following: Plaintiff saw a chiropractor once a week and got massage therapy twice a month;

5   she claimed that she napped because her pain prevented sleep; she admitted to having "advanced

6   computer skills" and, thus, sometimes typed letters.  Still, Plaintiff claimed that she could not

7   work, even with accommodations.

8      26. Plaintiff claims that her activity in the surveillance is consistent with her

9   estimation of her abilities.

10      27. Defendant provided Plaintiff's chiropractor, Dr. Kyle Yoder, and osteopath

11   Dr. Gabbay with copies of the surveillance video and investigative report and asked them to

12   comment on Plaintiff's ability to work.  Dr. Yoder advised Defendant that Plaintiff had a limited

13   ability to sustain activity without increasing her pain levels.  He stated that this was documented

14   objectively through imaging studies.

15      28. Dr. Gabbay did not respond, although he was asked to do so twice.

16      29. On January 27, 2011, Defendant determined that Plaintiff should undergo

17   an independent medical examination ("IME").

18      30. The IME occurred on May 4, 2011, with Dr.  Aubrey A. Swartz, an

19   orthopedic surgeon in Modesto, California.

20      31. Dr. Swartz performed a physical examination of Plaintiff and reviewed her

21   records.  His report, dated May 17, 2011, stated that there were no objective neurologic findings

22   supporting Plaintiff's inability to work.

23      32. On May 24, 2011, Defendant sent chiropractor Dr. Yoder a copy of the

24   IME report and asked whether he disagreed with any of the recommended restrictions or

25   limitations.

26      33. Dr. Yoder responded that he was no longer treating Plaintiff, who had

27   moved out of the area, but during the time he treated her he found that she had flareups when she

28   tried to walk or sit for longer than he had recommended in November 2010.  He believed that the

objective findings were sufficient to justify Plaintiff's self-reported levels of pain.

34.     Specifically the letter stated:

My opinion is based on treating this patient for over a year, in my experience of 23 years in treating patients, and a [sic] on a review of an MRI report on Ms. Bertelsen.

I respect the opinion of the IME doctor while being mindful that an independent review of a patient seen on a one time basis has limits when compared to the observations of a physician with long-term relationship with a patient.

I administered Chiropractic therapy to this patient for over a year and during that time was able to establish the effect that certain activities bad on the patient's pain levels.  I no longer treat Ms. Bertelsen as she has moved out of the area, and have not been retained to do a complete IME report.  However, I have reviewed the functional limitations reported by this patient on November 18 to Hartford and found that they represent the patient's functional limitations as I have noted in treating her and handling flare ups associated with the patient attempting to exceed these functional limits. She states she can walk for an hour and ½ and if she exceeds this her pain level spikes to a 6 or 7.  She then gets fatigued and lies down to bring the pain level down.  She states she can sit for 2-3 hours and at that point the pain is reaching levels of 7-8 on the pain scale.  Having treated many patients over the years with similar MRI findings I do not find these stated limits to be in any way unusual.  The IME opines that her fatigue can be attributed to her medication.  The fatigue can also be attributed to handling pain at these levels just as easily.  She opines that the muscle relaxants are to blame without really knowing if this is the case.  Presumably these medications were prescribed by a treating physician who was familiar with Ms. Bertelsens' [sic] case and also presumably would not over-prescribe unnecessarily.

It is my opinion that this patient self-reported her limitations reasonably.  The IME report reflects the opinion of a doctor who has seen the patient one time.  As a former QME I know the limitations of this type of review. In this case the objective findings are sufficient to justify the type of pain the patient reports.  I do not agree with the findings of the IME report.

(ECF No. 2-4 at CF 000216.)

35.     The same report was sent to Dr. Gabbay, who, again, did not respond.

36.     On June 27, 2011, an Addendum to Defendant's previous Employee Analysis Report ("EAR") was prepared based on Dr. Swartz's May 17, 2011, report.  The Addendum noted that there were 284 occupations at the "closest" and "good" levels with directly related transferable skills.  The closest match was telecommunications specialist, with a monthly

wage of $7,442.

37.     On June 28, 2011, Defendant's investigative analyst summarized the status of the claim.  He noted that Plaintiff claimed she was unable to sit or stand for more than two or three hours and tired easily; she claimed she could not work without increasing pain.  He summarized the medical records, the surveillance, Dr. Yoder's response, and the IME findings.  He concluded the following: based on the weight of the medical evidence, she could perform full time light work with restrictions; and the EAR confirmed that Plaintiff had sufficient skills to obtain employment within her specific functional capabilities and required earnings potential.

**D.     Defendant Terminates Plaintiff's Disability Benefits and Plaintiff Appeals**

38.     On July 7, 2011, Defendant sent Plaintiff a letter advising her that her claim for additional benefits was denied effective July 6, 2011.  In the letter, Defendant conveyed that based on the weight of the medical evidence Defendant believed Plaintiff could perform full time light work with restrictions.  Therefore, Defendant concluded that Plaintiff had sufficient skills to obtain employment within her specific functional capabilities and required earnings potential and therefore was not disabled for any occupation.

39.     On January 3, 2012, Plaintiff appealed the denial of her claim.

40.     The appeal letter enclosed additional records from Airport Medical Clinic, which showed that Plaintiff treated there twice in 2011 for treatment of a sinus condition, but did not seek treatment for back pain.

41.     The appeal letter enclosed the record of Plaintiff's visit with osteopath Dr. Wendy Flapan on October 11, 2011, who is board-certified in physical and rehabilitation medicine, who prescribed eight sessions of physical therapy.

42.     The appeal letter enclosed the physical therapist's records, which stated that at the end of the eight prescribed sessions, Plaintiff reported an overall 45% reduction in pain and was able to continue with home exercises.  The records also stated, "Range of motion and strength are within normal limits in spine and extremities.  Muscle tension in paraspinal musculature has remarkably decreased."  (ECF No. 6-2 at CF 000952.)

43.     The appeal letter also enclosed personal statements from Plaintiff's sister, a

1   friend of Plaintiff, a former coworker of Plaintiff, and Plaintiff herself.

2          44.      Counsel also sent a report by S. White, M.D., who performed a medical

3   assessment of Plaintiff's ability to perform work-related activities on December 7, 2011.  Dr.

4   White concluded that Plaintiff could frequently lift and carry up to 10 pounds, occasionally lift

5   and carry 11 to 20 pounds, and never lift or carry more than that.   Plaintiff could occasionally

6   reach, push and pull.  Dr. White did not list any medical findings that limited Plaintiff's ability to

7   reach, push or pull.  Plaintiff could sit three hours in an eight hour work day, stand for one hour

8   and walk for two hours.  Again, Dr. White did not list any medical findings that supported this

9   assessment.  Dr. White concluded that Plaintiff was able to return to work, although for six hours

10  a day in alternating positions.  However, no medical findings supported that assessment either.

11         45.      Defendant's Appeal Department reviewed the claim file, including Dr.

12  Swartz's IME report, the surveillance reports, and the report of the SIU investigator.

13         46.      Additionally, the Defendant's Appeal Department obtained a record review

14  by Steven M. Lobel, M.D., board certified in physical medicine and rehabilitation and physical

15  medicine and rehabilitation/pain medicine.

16         47.      On February 23, 2012, Dr. Lobel prepared a report of his evaluation of

17  Plaintiff's medical records, the IME report, and the surveillance tapes.  He was asked to address

18  four areas: Plaintiff's functional limitations, if any, from July 6, 2011 onward; the reasons, if any,

19  he disagreed with Plaintiff's treating physician; the restrictions and limitations, if any, that were

20  required because of Plaintiff's complaints of fatigue and chronic pain; and Plaintiff's need to rest.

21         48.      Dr. Lobel concluded that Plaintiff was able to sit without restriction, could

22  stand and walk for up to 20 minutes at a time for up to two hours in an eight hour workday, could

23  climb stairs occasionally, and could reach.  He acknowledged that she had pain, but concluded

24  that pain is subjective and, for this claimant, pain did not add to impairment, and did not require

25  restrictions or limitations.

26         49.      Plaintiff claims that Dr. Lobel did not receive the Social Security Award

27  information or witness statements.  Defendant does not dispute this.  Nor is there any evidence

28  that Defendant provided Dr. Swartz with the updated information that the SSA had awarded

1    Plaintiff disability benefits.  (*See* ECF No. 25 at 6:3–18.)

2            50.    Defendant's Appeal Department independently reviewed the claim file, the

3    surveillance, the medical records, the investigation report, the appeal and Dr. Lobel's report, and

4    determined that Plaintiff was not entitled to benefits beyond July 7, 2011.

5            51.    Plaintiff's appeal was denied by letter dated February 27, 2012.

6            52.    Plaintiff brought this action through a verified complaint filed on May 29,

7    2012.  (Compl., ECF No. 1.)

8            53.    The parties have waived a trial and request that the Court rule on their

9    cross-motions for judgment pursuant to Federal Rule of Civil Procedure 52.  (Joint Status Report,

10   ECF No. 12 at 3:8–9.)

### II.    CONCLUSIONS OF LAW

#### A.    <u>Legal Standard</u>

11           1.     Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried

12   on the facts without a jury . . .  the court must find the facts specially and state its conclusions of

13   law separately.  The findings and conclusions may be stated on the record . . . or may appear in an

14   opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule

15   58."

16           2.     This Court has jurisdiction pursuant to the Employment Retirement Income

17   Security Act ("ERISA").  *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521

18   (9th Cir. 1985) ("ERISA creates a federal cause of action, with concurrent state and federal

19   jurisdiction, over claims by an employee 'to recover benefits due to him under the terms of his

20   plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits

21   under the terms of the plan.'") (quoting 29 U.S.C. § 1132(a)(1)).

22           3.     "ERISA represents a careful balancing between ensuring fair and prompt

23   enforcement of rights under a plan and the encouragement of the creation of such plans."

24   *Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010) (internal citations and quotation marks

25   omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they

26   had earned, but Congress did not require employers to establish benefit plans in the first place."

27

28

1   *Id.* (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

2           4.      The parties agree that the long-term disability plan at issue in this case is an

3   "employee welfare benefit plan" subject to ERISA.  *See* 29 U.S.C. § 1002(1) (defining "employee

4   welfare benefit plan" and "welfare plan" to include "any plan, fund, or program . . . established or

5   maintained by an employer or by an employee organization, or by both, to the extent that such

6   plan, fund, or program was established or is maintained for the purpose of providing for its

7   participants or their beneficiaries, through the purchase of insurance or otherwise[] . . . benefits in

8   the event of sickness, accident, disability, death or unemployment").

9           5.      When a benefit plan gives the administrator discretionary authority to

10  determine eligibility for benefits or to construe the terms of the plan, the Court reviews the

11  administrator's decision for abuse of discretion.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

12  101, 115 (1989); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir.

13  2009); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir.

14  2008).

15          6.      Because the parties agree that the policy provides Defendant with

16  discretion to interpret the policy, the abuse of discretion standard applies here.

17          7.      "In the absence of a conflict, judicial review of a plan administrator's

18  benefits determination involves a straightforward application of the abuse of discretion standard."

19  *Montour*, 588 F.3d at 629.  "In these circumstances, the plan administrator's decision can be

20  upheld if it is 'grounded on *any* reasonable basis.'" *Id.* (quoting *Sznewajas v. U.S. Bancorp Am. &*

21  *Restated Supp. Benefits Plan*, 572 F.3d 727, 734–35 (9th Cir. 2009)); *see also Conkright*, 559

22  U.S. at 521 ("Applying a deferential standard of review . . . means only that the plan

23  administrator's interpretation of the plan 'will not be disturbed if reasonable.'") (quoting

24  *Firestone*, 489 U.S. at 111).

25          8.      However, when the plan administrator both determines whether an

26  employee is eligible for benefits and also is responsible for paying benefits out of its own pocket,

27  this dual role creates a conflict of interest.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112

28  (2008).  On the one hand, such an administrator is responsible for administering the plan so that

those who deserve benefits receive them.  On the other hand, such an administrator has a financial incentive to withhold funds and pay as little benefits as possible.  *Id.*; *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965–66 (9th Cir. 2006) (en banc) (citing *Doe v. Group Hosp. & Med. Servs.*, 3 F.3d 80, 86 (4th Cir. 1993) (noting that "to the extent that [the administrator] has discretion to avoid paying claims, it thereby promotes the potential for its own profit") *and Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561 (11th Cir. 1990) (similarly noting that an administrator's role as a fiduciary role lies in conflict with its role as a profitmaking entity)).

9.     Because Defendant both administered and funded the long-term disability benefits at issue in this action, Defendant was operating under a conflict of interest.

10.     A district court should consider that conflict of interest as a factor in determining whether the plan administrator has abused its discretion in denying benefits. *Firestone*, 489 U.S. at 115; *Abatie*, 458 F.3d at 965 ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review."); *Montour*, 588 F.3d at 630 ("Simply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis.").

11.     The significance of the factor will depend upon the circumstances of the particular case.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.  *Abatie*, 458 F.3d. at 968–69.

12.     "Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary [Social Security

12

1   Administration] disability determination, if any."  *Montour*, 588 F.3d at 630 (citing *Glenn*, 554

2   U.S. at 105 *and Saffon*, 522 F.3d at 869–73).

3          **B.        Defendant's Lack of Explanation for Terminating Plaintiff's Benefits**

4          13.      An administrator must adequately explain the reasons for the denial of

5   benefits, or in this case, the reversal of benefits previously provided.  *See* 29 U.S.C. § 1133

6   ("every employee benefit plan shall . . . provide adequate notice in writing to any participant or

7   beneficiary whose claim for benefits under the plan has been denied, setting forth the specific

8   reasons for such denial, written in a manner calculated to be understood by the participant"); *see*

9   *also* 29 C.F.R. § 2560.503-1(h)(2)(iv) (providing that "claims procedures [must] [p]rovide for a

10  review that takes into account all comments, documents, records, and other information submitted

11  by the claimant relating to the claim, without regard to whether such information was submitted

12  or considered in the initial benefit determination").  Accordingly, claimants with defective claims

13  must be provided the opportunity to provide missing or relevant information.  *See Beckstrand v.*

14  *Electronic Arts Group Long Term Disability Ins. Plan*, No. 1:05-CV-0323 AWI GSA, 2008 WL

15  4279566, at *8 (Sept. 16, 2008) ("ERISA regulations call for a 'meaningful dialogue' between the

16  claims administrator and the beneficiary) (citing *Saffon v. Wells Fargo & Co. Long Term*

17  *Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008)).

18         14.      *Saffon*, 522 F.3d at 863, is instructive.  In that case, the plan administrator

19  terminated the plaintiff's long-term disability benefits reasoning "[t]he medical information

20  provided no longer provides evidence of disability that would prevent you from performing your

21  job or occupation.  You no longer meet the definition of disability . . . ."  *Id.* at. 869.  The Ninth

22  Circuit held that the letter's purported explanation was insufficient.  The letter did not explain

23  **why** the information plaintiff had already provided was insufficient.  Nor did the letter address the

24  assertion by the plaintiff's doctor that she was unable to perform her job.  Furthermore, the letter

25  did not describe **what** information plaintiff could have provided to perfect her claim.  *Id.* at 870–

26  71.

27         15.      Defendant's decision to terminate Plaintiff's benefits suffers from the same

28  defects as in *Saffon*.  The termination letter at issue in this action states that Plaintiff no longer

13

1    meets the definition of disability but fails to explain why that is the case.  Like the letter in *Saffon*,

2    Defendant did not explain why the information Plaintiff previously provided was insufficient, a

3    tall order since Defendant had already approved Plaintiff for long-term disability benefits.  Nor

4    did the letter counter Dr. Yoder's detailed opinion regarding the limitations of IME review or his

5    belief that Plaintiff's self-reported levels of pain were consistent with objective findings.

6    Furthermore, Defendant's letter does not discuss what information Plaintiff is to provide to

7    support her inability to perform the duties of any occupation beyond what she has already

8    provided.  *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011)

9    ("[W]here the denials [are] based on absence of some sort of medical evidence or explanation, []

10   the administrator [is] obligated to say in plain language what additional evidence it need[s] and

11   what questions it need[s] answered in time so that the additional material c[an] be provided."),

12   *reh'g and reh'g en banc denied*.

13           16.     Defendant contends that its doctors reviewed Plaintiff's claims and

14   concluded that her diagnosis was not supported by the medical evidence.  This contention is

15   disingenuous for two reasons.  First, the opinions by Defendant's doctors do not explain why

16   Defendant initially concluded that Plaintiff was fully disabled in any occupation but reversed that

17   opinion.  For example, the opinions by Defendant's doctors fail to address any change in

18   Plaintiff's medical condition.  Defendants do not point to any medical evidence to indicate that

19   Plaintiff has improved, for example, that Plaintiff's visits to the hospital have ceased, that she is

20   progressing with a particular type of treatment, or that she is no longer taking medication as

21   prescribed.  Any of these facts would tend to show that Plaintiff's condition improved such that

22   she is no longer disabled.  Instead, Defendant insinuates that Plaintiff has been fabricating the

23   extent of her disability all along and that her previous doctors have been duped, are incompetent,

24   or are liars.  However, Defendant cannot discredit its previous finding of disability or the

25   underlying medical evidence without an explanation.  Defendant previously accepted medical

26   evidence from 2008 to 2011 in finding Plaintiff disabled first in her own occupation and then

27   disabled in any occupation.  Defendant's failure to explain its reversal and failure to distinguish

28   the same medical evidence it previously relied upon to find Plaintiff disabled heightens this

1    Court's scrutiny of Defendant's inherent conflict.

2        **C.    Plaintiff's Reliable Medical Evidence**

3            17.    An administrator must also credit a claimant's reliable evidence. *Abatie*,

4    458 F.3d at 968; *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 773 (7th Cir. 2010) ("While

5    the significance of a procedure or a prescription can be disputed, the existence of such things

6    when established in the record cannot be."). Over a period of several years, Plaintiff complained

7    of back pain, received procedures and injections related to that pain. She provided credible

8    medical evidence that she was disabled from any occupation based on information from three

9    treating physicians: Dr. Yoder, Dr. Gabbay, and Dr. White.

10           18.    In terminating Plaintiff's benefits, Defendant did not credit Plaintiff's

11   reports of pain, offering the opinions of Dr. Lobel and others that pain is a subjective symptom.

12   Courts have held, however, that administrators may not require pain to be proven by objective

13   evidence because pain, by its nature, is a subjective phenomenon. *Saffon*, 522 F.3d at 872

14   ("individual reactions to pain are subjective and not easily determined by reference to objective

15   measurements"); *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) ("Unlike most medical

16   conditions capable of supporting a finding of disability, pain cannot be objectively verified or

17   measured. While the physical conditions causing pain can usually be objectively ascertained, the

18   pain itself cannot; the very existence of pain is a completely subjective phenomenon."); *Hawkins*

19   *v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (Posner, J.)

20   (noting that pain and fatigue cannot be objectively measured). Therefore, Defendant's reliance on

21   statements that Plaintiff's experience of pain was subjective further evidences the extent of

22   Defendant's conflict and how it affected its determination that Plaintiff was no longer disabled.[5]

23   *See Saffon*, 522 F.3d 873 ("If MetLife is turning down Saffon's application for benefits based on

24   Saffon's failure to produce evidence that simply is not available, that too may bear on the degree

25   _____

26   [5] Even if pain were measurable by objective standards (which it is not), there is no evidence that
     Defendant's plan requires proof by objective medical evidence. *Compare Riffey v. Hewlett-*
27   *Packard Co. Disability Plan*, No. CIV.S-05-1331 FCD/JFM, 2007 WL 946200, at *2 (E.D. Cal.
     Mar. 27, 2007) (describing plan that required disability to be supported by "objective medical
28   evidence").

                                          15

of deference the district court shall accord MetLife's decision and on its ultimate determination as to whether Saffon is disabled.").

### D.      **Defendant's Cherry-Picked Evidence**

19.      Furthermore, the Court finds that the Defendant appears to have cherry-picked its evidence. *See Glenn*, 554 U.S. at 118 (noting administrator emphasized a certain medical report that favored a denial of benefits, deemphasized certain other reports that suggested a contrary conclusion, and failed to provide its independent vocational and medical experts with all of the relevant evidence); *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (holding administrator acted arbitrarily when it "cherry-picked" statements from the plaintiff's medical history that supported the decision to terminate her benefits, while ignoring evidence to support her disability).

20.      For example, Defendant did not provide its doctors or update Dr. Swartz, who had already examined Plaintiff, with evidence that Plaintiff was receiving SSA disability benefits. *See Montour*, 588 F.3d at 634 ("[N]either of Hartford's professional experts mentioned the SSA's contrary conclusion, 'not even to discount or disagree with it, which indicates that [they] may not even have been aware of it.'") (quoting *Glenn v. Metro. Life. Ins. Co.*, 461 F.3d 660, 669 (9th Cir. 2006)).  Nor did Defendant update its doctors with evidence that Dr. Yoder, Plaintiff's chiropractor, disagreed with the IME and the surveillance tapes.  Instead, Defendant, in effort to gain concessions from Dr. Yoder and Dr. Gabbay, provided them with surveillance of Plaintiff and the IME.  However, Defendant did not reciprocate by providing its own doctors with information adverse to their findings regarding Plaintiff.  Defendant did not update its doctors with Plaintiff's favorable SSA determination or personal statements; both corroborated her treating physicians' assessment that Plaintiff had limited functionality.  These facts also weigh against the credibility of Defendant – a party already inherently conflicted.

21.      Relatedly, the Court also notes the inordinate amount of weight Defendant placed on the surveillance information.  The Ninth Circuit has admonished district courts not to overly rely on surveillance video, particularly where the restrictions are consistent with the video surveillance. *Montour*, 588 F.3d at 633 ("that Plaintiff could perform sedentary activities in

1  bursts spread out over four days does not indicate that he [ ]is capable of sustaining activity in a

2  full-time occupation.").  Unlike other cases where courts have upheld the termination of benefits,

3  here Defendant observed Plaintiff performing tasks consistent with her reported limitations over a

4  series of days.  *Compare Finley v. Hartford Life & Acc. Ins. Co.*, 400 F. App'x 198, 200–01 (9th

5  Cir. 2010) (unpublished) (upholding denial of benefits after defendant conducted surveillance and

6  plaintiff gave contradictory explanations for her activities); *Bender v. Hartford Life Ins. Co*., No.

7  C 09-01163 MMC, 2011 WL 3566483, at *15 (N.D. Cal. Aug. 12, 2011) (upholding denial of

8  benefits where video surveillance contradicted plaintiff's representation of disability).  Here,

9  Plaintiff reported that she could only perform activities for a few hours at a time; nothing in the

10  surveillance contradicts those statements.  Furthermore, as discussed above, Defendant provided

11  the surveillance to Plaintiff's doctors in apparent hopes that they would reverse their previous

12  findings.  However, Defendant did not reciprocate by providing information favorable to Plaintiff

13  to its own doctors, such as the SSA determination of Plaintiff's disability or personal statements

14  accounting the extent of Plaintiff's disability.

15       22.   The Court further finds that Defendant had been paying Plaintiff long-term

16  disability benefits under the "any occupation" policy, and Defendant failed to uncover any

17  significant changes in Plaintiff's condition.  Administrators are certainly free to evaluate

18  continuous disability as set forth in their written policies, however, ERISA requires that they

19  provide some explanation if they terminate benefits.  *Beckstrand*, 2008 WL 4279566 at *8

20  ("[plaintiff] was never told why [certain medical findings] caused him to be disabled in 2001 but

21  not in 2004."); *Leger*, 557 F.3d at 832 (considering the prior determination among other factors to

22  conclude that administrator's decision was arbitrary and capricious); *McOsker v. Paul Revere Life

23  Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates

24  forever as an estoppel so that an insurer can never change its mind; but unless information

25  available to an insurer alters in some significant way, the previous payment of benefits is a

26  circumstance that must weigh against the propriety of an insurer's decision to discontinue those

27  payments.").  For example, if an administrator terminates benefits based on plaintiff's

28  improvement, one would expect the medical evidence to disclose an improvement.  *Saffon*, 522

17

F.3d at 871 ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled.  In order to find her no longer disabled, one would expect the MRIs to show an improvement").  Here, Defendant found Plaintiff disabled and paid benefits from July 2008 to July 2011.  In terminating Plaintiff's benefits, however, Defendant did not explain why the medical findings that caused her to be disabled in 2008 were no longer sufficient.  Nor did Defendant point to any medical evidence suggesting that Plaintiff had improved.  Although Defendant may have suspected that Plaintiff was fabricating the extent of her disability, Defendant did not suggest how Plaintiff had supposedly fabricated the medical evidence supporting her disability, or somehow fooled her doctors into diagnosing her condition and prescribing medications and epidurals beyond what her symptoms called for.  This lack of explanation further discredits Defendant's decision.

### E.       The Social Security Administration's Determination of Plaintiff's Disability

23.     Additionally, the Social Security Administration determined that Plaintiff was disabled under its definition.  "Evidence of a Social Security award of disability benefits is of [such] sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion."  *Salomaa*, 642 F.3d at 679.  "In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence."  *Montour*, 588 F.3d at 635.

24.     Under the Social Security Act, individuals who are "under a disability" are eligible to receive benefits.  42 U.S.C. § 423(a)(1)(D).  A "disability" is defined as "any medically determinable physical or mental impairment" which prevents one from engaging "in any substantial gainful activity" and is expected to result in death or last "for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Such an impairment must result from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  The Act also provides that a claimant will be eligible for benefits only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national

1   economy . . . ."  42 U.S.C. § 423(d)(2)(A).

2           25.     Despite the SSA's determination that Plaintiff was disabled under its

3   definition, Defendant maintained that Plaintiff was not disabled under its policy.  Comparing the

4   SSA's definition of disability above with Defendant's definition of disability does not disclose

5   why Plaintiff might be disabled under the SSA's definition and not the Defendant's.  In fact, it

6   would seem that the SSA's definition of disability is stricter than Defendant's.  Although

7   Defendant noted the existence of different definitions used by the SSA and its policy, it failed to

8   explain *why* the differences result in a finding that Plaintiff is disabled under the SSA definition

9   but not the policy.  This lack of explanation further demonstrates the pervasive nature of

10  Defendant's conflict.

11          26.     Given the totality of the record, viewed through the lens of the standard of

12  review, the Court finds that the Defendant abused its discretion when it terminated Plaintiff's

13  long-term disability benefits.  *See Abatie*, 458 F.3d. at 969 ("We believe that district courts are

14  well equipped to consider the particulars of a conflict of interest, along with all the other facts and

15  circumstances, to determine whether an abuse of discretion has occurred."); *see also Montour*,

16  588 F.3d at 637 (holding administrator abused its discretion in terminating long-term disability

17  benefits to claimant who suffered from acute stress disorder, and back and knee impairments);

18  *Salomaa*, 642 F.3d at 627, 680 (holding administrator abused its discretion in denying long-term

19  benefits to claimant who suffered from chronic fatigue syndrome), *reh'g and reh'g en banc*

20  *denied*; *Saffon*, 522 F.3d at 866, 873–74 (remanding to district court to reevaluate whether

21  administrator abused its discretion in denying long-term benefits to a claimant who suffered from

22  degeneration of her cervical spine).  Defendant, likely upon receiving information that Plaintiff

23  was training to be a masseuse and volunteering, determined that Plaintiff was fabricating the

24  extent of her disability.  Although the Court sympathizes with the conundrum of administrators to

25  try and determine whether claimants are being truthful, the manner in which Defendant issued its

26  decision cannot be countenanced.  "An administrator does not do its duty under the statute and

27  regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.'  Nor does

28  it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo."

1    *See Salomaa*, 642 F.3d at 680.

2        **F.**   <u>**Remedy**</u>

3          27.   An ERISA claimant whose benefits have been terminated is entitled to a

4  different remedy than a claimant whose initial application for benefits has been wrongfully

5  denied.  *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1220–21 (9th Cir.

6  2008) (citing *Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 775–76

7  (7th Cir. 2003)).  If an administrator terminates continuing benefits as a result of arbitrary and

8  capricious conduct, the claimant should continue receiving benefits until the administrator

9  properly applies the plan's provisions.  *Id.* at 1221–22 (holding the district court abused its

10  discretion by failing to award retroactive reinstatement of long-term disability benefits that

11  defendant terminated); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir.

12  2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was

13  simply contrary to the facts."); *id.* (affirming district court's award of benefits and denial of

14  request to remand where disability insurer abused discretion by terminating benefits).  Here, it is

15  undisputed that Defendant terminated Plaintiff's long-term disability benefits upon a

16  determination that she was no longer disabled.  Retroactive reinstatement of benefits is therefore

17  the appropriate remedy.

18        **III.   CONCLUSION**

19       For the foregoing reasons, the Court finds that Defendant abused its discretion by

20  terminating Plaintiff's long-term disability benefits.  Therefore, it is HEREBY ORDERED:

21       1.   Plaintiff's Motion for Judgment under Rule 52 (ECF No. 17) is GRANTED;

22       2.   Defendant's Motion for Summary Judgment (ECF No. 20) is DENIED;

23       3.   Defendant shall reinstate Plaintiff's long-term disability benefits retroactive to the

24  date upon which Defendant ceased paying such benefits;[6]

25       4.   The clerk of the Court shall enter judgment in favor of Plaintiff; and

26       5.   The parties shall meet and confer as soon as practicable for the purpose of

27

28  [6] The Court expresses no opinion as to whether future determinations of Plaintiff's disability or non-disability by Defendant under its policy would be upheld.

providing the Court with an accounting to determine the amounts owed to Plaintiff in a proposed amended judgment to be filed within 14 days of entry of this Order;

6.      Any requests for costs or motions for attorney's fees shall be governed by Local Rules 292 and 293, respectively, including applicable deadlines; and

7.      The Clerk of the Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: February 13, 2014

Troy L. Nunley
United States District Judge